UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**ELECTRONICALLY FILED**

UNITED STATES OF AMERICA                    PLAINTIFF

v.                    CRIMINAL ACTION NO. 3:24-CR-00037-BJB

ALLEN LOVE                    DEFENDANT

**ALLEN LOVE'S SENTENCING MEMORANDUM**

Allen Love has admitted selling illegal firearms, including a rifle without a serial number and a half dozen adapters for converting lawful weapons into machine guns. (Plea Agreement, R. 28 pp. 1-2, Page ID # 54-55.)  The United States Sentencing Guidelines recommend that his punishment should be imprisonment for 30 months (Presentence Rep., R. 32 pg. 14 ¶ 72, Page ID # 101); the average penalty imposed by federal judges in comparable cases is 26 to 27 months in prison. (*Id.* at pp. 14-15 ¶ 73, Page ID # 102.)

Several of Mr. Love's close friends have contributed letters that show him to be an unusually generous and compassionate friend with real talent and pride in his vocation, automobile repair. (Attachment 1, Letters of Support.)  Mr. Love's ability to resume

that line of work, though, depends on his recuperation from a severe back injury, an imperative that may have some bearing on the Court's decision regarding his ultimate punishment. (*See* Attachment 2, Medical Records.) Given Mr. Love's qualities of character, his negligible criminal history, his work skills, and his physical condition, a penalty less severe than that recommended by the Guidelines will be "sufficient, but not greater than necessary, to comply with the purposes" of criminal punishment in this case. 18 U.S.C. § 3553(a).

"His friendship has been a cornerstone of my life," writes Courtney Jurek of Mr. Love, a friend for more than 15 years. (Letters of Support, pg. 1.) "Allen has always been there," professes Ruth Hutchings, who has known Mr. Love for over 35 years: "Whenever I have needed him. Just a phone call away." (*Id.* at pg. 5.) Mr. Love's aunt, Ruth Ann Parish, has had him in her life since he was born 40 years ago, and she says, "I am very grateful for the opportunity to know him." (*Id.* at pg. 7.)

Ms. Jurek expresses the central theme of all the letters of support when she praises Mr. Love for having "always been incredibly generous, often going above and beyond without expecting anything in return." (Letters of Support, pg. 1.) Noting that Mr. Love has "a passion for fixing and painting cars," she recounts that "[h]e painted my 1993 Honda Civic Hatchback multiple times, first transforming it from red to Cadillac white

2

pearl, and later to Breast Cancer Awareness pink after an accident. He did all the work free of charge, displaying his generous spirit and commitment to helping those he cares about." (*Id.* at pg. 2.) "Allen has amazing talents that he freely shares with other people," writes his aunt, Ms. Parish. "If he tells you he will do something, you can count on him to be there and to do it to the best of his ability." (*Id.* at pp. 7-8.) "If you have a broken home appliance, car, or computer," Ms. Parish continues, "Allen can fix it. If he doesn't have the knowledge, he will research and learn how so he can help you. He puts other people's needs first." (*Id.* at pg. 7.)

"His kindness extends to everyone around him," Ms. Jurek affirms. (Letters of Support, pg. 2.) An early example comes from Mr. Love's high school years, when he took a classmate under his wing; the young man "was experiencing hard times at home and in life," Ms. Parish recalls, and "Allen stood strong and helped his friend through very difficult times that the young man thought he would not live through." (*Id.* at pg. 8.) "The young man is now forty-one years old, is holding down a full-time job, happily married to a lovely woman, has two beautiful sons and he credits Allen for saving his life and helping him to be who he is today." (*Ibid.*) A later example of this generosity is embodied in Mr. Love's efforts on behalf of the Toys for Tots gift drive, which he helped while working as manager of a popular pizza store. "He supported the motorcycle rides and fundraising activities," Ms. Parish writes,

and "Allen himself donated one week's pay to provide toys for the children…." (*Ibid.*)  On top of his own donation, Mr. Love "also challenged the other managers to do the same," and several of them in fact did so.  (*Ibid.*)  Mr. Love "doesn't ignore the need for help," his aunt writes: when his friends have been in difficult straits, "Allen has … provided Christmas, birthday, Easter gifts in addition to [money for] clothing, food, … rent and medical needs…."  (*Ibid.*)

Mr. Love is a "doting father" to his four year old daughter – she "is his joy and he is her hero," Ms. Parish observes – and he is also a much-needed father figure for his nephew, the son of his late brother.  (Letters of Support, pp. 7, 9.)  "In 2012 Allen's brother passed away and left behind a four-year-old son to be raised by Allen's mother," Ms. Parish explains:

> The child's father was preparing to send his young son to a private school in the fall of 2012.  In July of 2012, Allen organized a motorcycle ride fundraising event in honor of his brother with the purpose of raising the funds to send the child to private school.  The event was successful!  They raised enough money to pay the Enrollment Fees and uniforms that allowed the child to attend Sacred Heart Catholic School in Indiana.

(*Id.* at pg. 9.)  "Allen also supported his nephew by attending the school shows that he participated in," Ms. Parish adds, and he "continues to support his nephew as much as he can in the absence of his father figure."  (*Ibid.*)

Mr. Love has many years' experience in the automobile repair business (*see* Presentence Rep., R. 32 pg. 13 ¶¶ 61-65, Page ID # 100), and he earnestly considers the work to be a profession imposing a high responsibility for providing honest and competent services.  His aunt writes that he "is very serious about providing safe and accurate work.  He will not take short cuts and will not take a risk on completing faulty work that would harm the drivers of the vehicles that he services." (Letters of Support, pg. 8.)  "He has told me of times he would need to send a request to an auto insurance adjuster to get adjustments made to the original estimate so he would be able to complete a job properly," Ms. Parish continues: "He doesn't want to risk the safety of others to complete a job quickly." (*Ibid.*)  "I love the work that I do," Mr. Love said in a note to counsel.  "It's gratifying, it is a dying art with a small amount of truly qualified people in the field with even less interested in learning it, and at the risk of sounding arrogant, I am a master at my craft and I miss it dearly."

Mr. Love's prospects of a successful return to work depend on his ability to recover from a very serious back injury sustained in a traffic accident last year.  (Presentence Rep., R. 32 pg. 12 ¶¶ 55-56, Page ID # 99.)  The collision happened on August 22, 2024, when a car slammed into the driver's side of Mr. Love's vehicle and caused it to flip over.  (Attachment 2, Medical Records, pg. 3.)  Mr. Love was seen in the hospital for a "shooting sharp

pain" that was radiating from the small of his back and was aggravated by "the smallest movement." (*Id.* at pg. 4.)  Medical examination confirmed that Mr. Love had suffered an "[a]cute complete burst fracture of the T12 vertebral body" (*ibid.*), an injury in which "the vertebral body shatters with enough force to separate the bone fragments and compromise the vertebra's ability to support the spine."  *Burst Fracture*, Columbia Univ. Irving Med. Ctr., https://www.neurosurgery.columbia.edu/patient-care/conditions/burst-fracture (Jan. 17, 2025).  Doctors also found "a 4 mm retropulsion of the posterior cortex of the vertebral body into the spinal canal" (Med. Rec. at pg. 4), meaning that a fragment of Mr. Love's vertebra had been displaced into the spinal canal.  *Burst Fracture, supra.*  Following the accident, Mr. Love was fitted with a back brace, but movement remains painful and difficult, and an MRI performed in mid-January has raised concern that the spine is not healing correctly and may require surgery to repair.  (Updated details about Mr. Love's prognosis will be provided if they can be secured before sentencing.)  The Columbia University article observes that "[a]s a result of the impaired mechanical strength following a burst fracture, the spine may develop an abnormal angulation that can lead to pain or further neurological compromise," and patients sometimes "develop a deformity known as kyphosis" which, if severe, "will progress over time unless surgically corrected."  *Burst Fracture, supra.*  The

6

article adds that surgery will be required "if the burst fracture has significantly impaired the mechanical strength of the spine or causes compression of the spinal cord or nerves, leading to neurological deficits." *Ibid.*[1]

Mr. Love's physical condition is one of several reasons that a prison term shorter than the Guidelines' recommendation would be appropriate in this case.  Although poor health is not ordinarily grounds for a reduced punishment, the Guidelines have traditionally recognized that "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."  U.S.S.G. § 5H1.4.  To qualify for a downward departure under this provision, "a district court must determine (1) whether the defendant has demonstrated, by independent medical evidence, that his or her medical condition is exceptional or outside the heartland of similar cases; and (2) whether the BOP can efficiently and economically accommodate the defendant's

---

[1]    Among the attachments to this memorandum is an annotated summary by Google AI that provides a helpful explanation of the meaning and significance of the medical terminology contained in Mr. Love's hospital diagnosis.  (*See* Attachment 3, Summary.)  The sources for the AI summary are specified in the text and can be independently reviewed, but counsel cannot personally confirm the reliability of the extract.

medical needs." *United States v. Goins*, 113 F.App'x 131, 134 (6th Cir. 2004). Failing this – and because Mr. Love's prognosis remains so uncertain, it may be impossible to satisfy the burden of proof for a downward departure – the statutory discretion granted the Court by 18 U.S.C. § 3553 allows the Court broader discretion to vary below the Guidelines, if deemed appropriate. *See United States v. Burton*, 230 F.App'x 505, 510 (6th Cir. 2007). It is useful in this context to consider Mr. Love's profile in respect to the three questions that the Eighth Circuit prescribes for people like him:

> Is the particular defendant's physical condition such that he or she would find imprisonment more than the normal hardship? Would imprisonment subject him or her to more than the normal inconvenience or danger? Does the physical condition have any substantial present effect on the defendant's ability to function?

*United States v. Rabins*, 63 F.3d 721, 729 (8th Cir. 1995). A man experiencing a severely painful and progressively worsening condition (possibly leading to permanent disability if uncorrected), in a prison environment and without the prospect of specialized surgery while incarcerated, yields a strongly affirmative answer to all three of the Eighth Circuit's criteria.

Mr. Love's vocational skills, combined with the support he can expect from his family and friends, make him a very good candidate for a crime-free life after he returns to the community. Scholarly studies "have consistently found that ex-offenders are

less likely to recidivate if they are employed," and that having a job can reduce the risk of recidivism by one third or more.  Dallan F. Flake, *When Any Sentence Is a Life Sentence*, 93 Wash. U. L. Rev. 45, 63 (2015) (citing, inter alia, a five-year study of 6500 ex-prisoners which found that "employment lower[ed] the odds of recidivism by 37.4%").[2]  The financial benefits of employment enable those convicted of crimes to "pay their bills and secure housing, thereby reducing the economic incentive to engage in income-generating crimes," and the intangible products of steady work – "greater personal support, stronger positive relationships, enhanced self-esteem, better mental health, and the ability to refocus one's time and efforts on pro-social activities" – come together to "reduce the likelihood of engaging in risky behaviors or associating with people who do so."  *Id.* at 62-63 (citation and punctuation omitted).  Add to this the benefit of a supportive network of people in the community and the probability of success is all the greater.  A three-year study of 400 parolees found that "offenders who were employed and had good quality ties to relatives were less likely to recidivate.  Second, offenders with good quality ties to relatives were more likely to be employed in the follow-up period."  Mark T. Berg and Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment,*

---

[2]    Available at https://journals.library.wustl.edu/lawreview/article/4507/galley/21340/download/.

*and Recidivism,* 28 Justice Quarterly 382, 402 (April 2011); *see id.* at pp. 389-390 (describing study methodology).[3]

One last consideration looks to what is probably the most objectively meaningful predictor of a law-abiding life – Mr. Love's criminal record.  He has a criminal history score of zero (Presentence Rep., R. 32 pg. 9 ¶ 45, Page ID # 96); this puts him in the class with the lowest recidivism rate of all offenders sentenced in the federal system: 30%, compared to the average rate of 49.3%.[4]

## CONCLUSION

Mr. Love urges the Court to exercise its latitude under the sentencing statute to impose a punishment lower than the minimum Sentencing Guidelines recommendation.

---

[3]    Available online at https://www.pacific-gateway.org/ (Workforce Trends).

[4]    U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview,* pg. 18, Appendix A-1, available at https://www.ussc.gov/sites/default/files/pdf/ research-and-publications/research-publications/2016 /recidivism_overview.pdf.

Respectfully submitted,

*Michael R. Mazzoli*

Scott C. Cox
Michael R. Mazzoli
Scott Coleman Cox, II
Attorneys for Defendant
COX & MAZZOLI PLLC
600 West Main Street, Suite 300
Louisville, Kentucky 40202
502-589-6190
MMazzoli@CoxAndMazzoli.com

## CERTIFICATE OF SERVICE

On January 17, 2025, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel of record.

*Michael R. Mazzoli*

Michael R. Mazzoli

11